UNITED STATES of America, Plaintiff,

v.

Jose E. PANZARDI–ALVAREZ, Nestor Manuel Cancel–Hernandez, Defendants.

Jose E.
PANZARDI–ALVAREZ, Petitioner,

v.

UNITED STATES of America, Respondent.

Nestor M.
CANCEL–HERNANDEZ, Petitioner,

v.

UNITED STATES of America, Respondent.

Cr. No. 85–493 (JAF), Civ. Nos. 87–0827 (JAF) and 87–1044 (JAF).

United States District Court, D. Puerto Rico.

Jan. 28, 1988.

Daniel López–Romo, U.S. Atty., San Juan, P.R., for plaintiff.

José E. Panzardi–Alverez, pro se.

José A. Fuentes–Agostini, San Juan, P.R., for defendant/petitioner Néstor M. Cancel–Hernández.

## OPINION AND ORDER

FUSTE, District Judge.

This case is submitted for decision concerning the 28 U.S.C. sec. 2255 habeas corpus petitions of former codefendants José E. "Polo" Panzardi–Alverez ("Panzardi") and Néstor Manuel "Papo" Cancel–Hernández ("Cancel"). With this opinion and order, we shall resolve the claims presented in the habeas petitions, along with those in several other pending motions—all toward a final determination of matters that have concerned this court, if not this judge, since April, 1985. A review of the factual and procedural history to date will facilitate our ruling on the filings before us.

## I.

Two days before he was scheduled to testify about the drug trafficking activities of, among others, petitioner Panzardi, the barely recognizable remains of government informant Avelino Cabrera–Díaz were found. After being shot to death, Cabrera–Díaz' torso had been burnt and his head, hands, and feet cut off. All of the gruesome details, provided by an agent of the FBI and eyewitnesses to the crime, can be found set out in the Detention Order, Docket Document No. 84, pp. 1–12. Panzardi and Cancel, along with Gloria Nieves–Báez, Héctor Arnaldo Reyes–Andújar, Arnaldo Hernández–Hernández, Angel Alberto Rosario–Hernández, and Jose D. Del Valle–Soledad, were subsequently indicted for the offense and each charged with: (1) depriving Cabrera–Díaz of his civil rights which resulted in his death, in violation of 18 U.S.C. sec. 241 ("Count I"); (2) aiding and abetting each other with the intent to retaliate against Cabrera–Díaz in violation of 18 U.S.C. secs. 1513 and 2 ("Count II"); and (3) aiding and abetting each other in the unlawful use of a firearm in violation of 18 U.S.C. sec. 16 ("Count III"). The six defendants eventually consented to separate plea agreements with the government, but only the circumstances surrounding those signed by Panzardi and Cancel are relevant to the instant action.

Cancel agreed to plead guilty to Counts I and II of the indictment, in exchange for a recommendation from his prosecutors for consecutive sentences of fifteen years imprisonment on Count I and ten years on Count II. Docket Document No. 187. In the agreement signed by Cancel, his attorneys, and the Assistant U.S. Attorney prosecuting the case, it was stated that then-defendant Cancel "understands and agrees that this Plea Agreement is not binding on the Court and that it may impose any sentence and conditions of imprisonment authorized by law ..." Cancel Plea Agreement, p. 2. In fact, Cancel was sentenced to 99 years imprisonment on both counts

and served with an additional $150,000 fine. Docket Document No. 227.

Panzardi consented to a different arrangement. In return for pleading guilty to Count I, testifying at any trial or other proceeding concerning the killing of Cabrera–Díaz, and promising to reveal any and all information he had about other criminal activity in Puerto Rico, including narcotics' trafficking, the government agreed to dismiss Counts II and III and to recommend that whatever sentence the court imposed for Count I run concurrently with any given at the conclusion of the other pending criminal proceedings. Docket Document No. 10. The government further agreed to make the full extent of Panzardi's cooperation known to the sentencing judge, to the United States Parole Commission, and to any other prosecuting authorities, if requested. Like Cancel's agreement, Panzardi's contained the identical clause stating that the terms of the agreement were not binding on the sentencing court which could impose any sentence and conditions of imprisonment authorized by law. Panzardi Plea Agreement, p. 3. Also, like Cancel, Panzardi was sentenced to be incarcerated for 99 years. Docket Document No. 237. No fine was imposed, however, and that sentence now runs concurrently with those for his convictions in the narcotics' trafficking cases.[1]

While our holdings concerning the habeas corpus petitions filed by Cancel and Panzardi comprise the bulk of this opinion, we are also at this point prepared to decide Panzardi's motion to reconsider his sentence on the basis of the cooperation he has rendered since signing the plea agreement. Initially, though, we must pass on Panzardi's *pro se* motion for our recusal, which focuses on Panzardi's choice of counsel to represent him on the charges and our inter-

vention in that respect. That necessitates a more detailed recital of the events from indictment to sentencing.

## II.

When the indictment was filed charging Panzardi with the death of Cabrera–Díaz, Panzardi was already being represented in one of the pending narcotics' trafficking cases, Criminal No. 85–116(CC), by attorney Charles G. White, a Florida lawyer who is not a member of the Federal Bar for the District of Puerto Rico. On December 4, 1985, White requested admission to defend Panzardi against the charges for the death of the witness, filing what would be the first of several motions for admission *pro hac vice*. Docket Document No. 9.

According to the rules of this court, the decision to admit an attorney *pro hac vice* is up to the discretion of each trial judge, who "in writing or otherwise, *may* find the person meets the standards for practice in the Court." Local Rule 204.2 of the United States District Court of the District of Puerto Rico (emphasis added). The fact that White had been admitted by another judge in this district and that he was clearly Panzardi's counsel of choice, along with his credentials, and finally his behavior subsequent to his request for admission, were all factors to be weighed in our determination.

White's initial motion was denied with a short order issued the same day the motion was filed. Docket Document No. 10. In so doing, we noted that not only had White failed to meet the procedural requirements of Local Rule 204 mandating the designation of a member of the bar of this court to act as local counsel, but, also, since he had been allowed to represent Panzardi in criminal case No. 85–117 (PG) four months be-

---

1. Panzardi was tried on the drug-trafficking charges without Cabrera–Díaz as a witness in criminal cases 85–116 (CC) and 85–117 (PG). In 85–116 (CC), subsequently reassigned to Judge Pérez Giménez after Judge Cerezo disqualified herself, Panzardi was eventually sentenced on June 30, 1987 to imprisonment for a period of six years to be served concurrently with case No. 85–493. In criminal 85–117 (PG), Panzardi had been sentenced to imprisonment for a period of twelve years and fined $12,000, said term of imprisonment to run consecutively to that imposed in criminal 85–116.

Although Panzardi was not fined, he lost to the Drug Enforcement Administration, by legal seizure, four airplanes, one Saab 900, and a Porsche 911. *See* 19 U.S.C. secs. 1607–1618; 21 C.F.R. secs. 1316.71–1316.81. *Panzardi v. United States*, Civ. No. 85–2241 (JAF), judgment entered for the government March 24, 1986.

fore, his request ran afoul of the limitation in the rule stating that "[a]ppearances allowed pursuant to this rule shall be limited to one case per year."[2] In an Expanded Order and Opinion issued on December 6, 1985, we elaborated on our initial findings and held the one-case-per-year limitation to be a valid constraint despite the effect it could have on a defendant's right to counsel of choice. *United States v. Panzardi–Alvarez*, 623 F.Supp. 108 (D.P.R.1985). We found then that since Panzardi had ample opportunity to secure the representation of perfectly capable attorneys who were members of the local federal bar, as he eventually did, his sixth-amendment right to effective assistance of counsel remained unabridged.[3]

After our December 4 short order of denial regarding White's initial petition, we were given the firsthand opportunity to observe his style and tactics. On December 5, a petition for a writ of habeas corpus pursuant to 28 U.S.C. secs. 2241 and 2255 was filed on behalf of codefendant Gloria Nieves–Báez. Docket Document No. 27. Nieves–Báez was Panzardi's girlfriend and had accompanied him the night Cabrera–Díaz was killed.[4] The petition was handwritten on yellow legal pad paper and signed by both Paul A. McKenna, whose petition to appear *pro hac vice* had been denied for failure to conform to the provisions of Rule 204.2, and Eric Singleton, who was apparently Ms. Nieves–Báez' local counsel. Although the petition failed to meet numerous filing standards, it was duly considered and denied that same day. Docket Document No. 26.

The behavior of Attorneys White and McKenna, however, not the merits of that petition, are of present concern. After filing the scribbled motion, McKenna and White positioned themselves at the doors to this judge's chambers, constantly knocking and inquiring whether a decision had been rendered. Finally, a U.S. Marshal was called to remove the two attorneys and abate the nuisance.[5]

Meanwhile, with White's request for admission denied, Panzardi retained the services of Peter John Porrata, a San Juan Attorney who represented Panzardi through his sentencing. Porrata almost immediately filed a slew of pretrial motions which we subsequently passed upon.[6]

2. Judge Cerezo's attempt to disqualify White on those grounds in Crim. No. 85–116 was ultimately overruled by the First Circuit. 816 F.2d 813 (1st Cir.1987).

3. White's attempt to reverse our decision through a petition for mandamus failed when a three-judge panel of the U.S. Court of Appeals for the First Circuit saw "no extraordinary circumstances" justifying circumvention of the rule against immediate appeals of orders disqualifying counsel and the strong policy against interlocutory review in criminal actions. *In re José E. Panzardi–Alvarez*, Order of Court, entered December 12, 1985 [782 F.2d 1025 (Table)]. Docket Document No. 41.

4. In many of his motion papers, Panzardi refers to Nieves–Báez as his common-law wife. We are unable to discern from the record any evidence of that relationship apart from Panzardi's assertions, and consequently cannot adopt that characterization in our holdings. Common-law marriage is not recognized in this jurisdiction. *See* Civil Code, 31 L.P.R.A. sec. 221.

5. In an affidavit submitted nearly two years later (hereinafter cited as "White Affidavit"), White characterizes the incident differently. Admitting that he "accompanied" McKenna in drafting and filing the habeas corpus petition,

White says their presence outside our office was meant to "politely inform this Court's Chambers of Mr. McKenna's availability for an immediate hearing." White Affidavit, p. 5. White then adds the following description of the events that transpired:

Interestingly enough, the only individual who actually spoke to either [White] or Mr. McKenna during this vigil did not instruct them to leave, as believed by the Court, but merely expressed his amusement at their reading of the Federal Rules of Criminal Procedure. He said, "No one around here pays any attention to that." The individual did not identify himself but merely laughed and left. It was shortly thereafter that Mr. McKenna and [White] abandoned their vigil. (White Affidavit, p. 5).

Although recourse to the U.S. Marshal's recollections would no doubt resolve the two versions, we do not wish to enter into such factual quibbling. Whatever or whoever persuaded them to cease harassing our chambers does not render their behavior prior to leaving any less improper.

6. We shall have occasion later in this opinion to evaluate the performance of Porrata when we consider Panzardi's habeas corpus claim of the deprivation of his sixth-amendment right to the effective assistance of counsel.

White, however, had only lost the first battle in an ongoing war. After Panzardi was denied release on bail in early January, White again moved, through Panzardi, for admission *pro hac vice*. Docket Document No. 120. In his January 21, 1986 motion, White argued that since he had corrected the procedural deficiencies of his first motion and since 1986 was a new and different calendar year, the limitations of Rule 204.2 should no longer apply. That request was denied, firmly, on February 7, 1986, Docket Document No. 137, when we held, first, that the term "one case per year" must require a twelve-month span between one appearance and the next. In that same opinion, however, we intimated that other considerations weighed more heavily than the provisions of the local rule in our determination to deny White's request. Sealed hearings, held on February 6 and 7, indicated that serious ethical considerations operated against White's admission. At that time, we provided no details from the hearings, noting only that they concerned the representation of codefendant Nieves–Báez. We later had occasion, as we shall have occasion later in this opinion, to discuss the details of those hearings, details that White must have been aware of at the time. No further hearings addressing those ethical concerns were requested by White and none were subsequently held.

From that point forward, Panzardi's defense proceeded apace with Porrata as sole counsel. The plea agreement was reached, then Panzardi's change of plea was taken on March 10, 1986. Panzardi was sentenced on April 30 and, on August 22, more than three months later and still through Porrata, Panzardi filed a motion to reduce his sentence pursuant to Fed.R.Crim.P. 35. Docket Document No. 253. In an effort to consider four of the defendants' Rule 35 motions together with the government's response concerning the extent and effects of the cooperation rendered by Panzardi, no ruling was made until April 23, 1987, when all of the defendants' requests were denied. Docket Document No. 264.

Three weeks later, Panzardi moved *pro se* for reconsideration of our denial of his Rule 35 motion. Docket Document No. 266. A July 14, 1987 hearing was ordered and in the meantime, on June 23, Panzardi moved once again for White's *pro hac vice* admission. Docket Document No. 270. Armed with new local counsel, and a recent First Circuit opinion invalidating the one-case-per-year rule, *United States v. Panzardi–Alvarez*, 816 F.2d 813 (1st Cir.1987),[7] Panzardi once again asserted his desire for White as his counsel. On July 2, 1987, we unsealed the record of the February 6 and 7 hearings to expand on our refusal to grant the request. Docket Document No. 274. Although we would not care to reiterate the revelations and determination that emerged from those hearings, because of their relevance to the motion for recusal we briefly set forth the facts leading to our decision to deny White's admission.

Our concern was activated initially by codefendant Nieves–Báez' representations to a U.S. Marshal of her interest in cooperating with the government and providing information about herself and her codefendants in this case. She had expressed the fear to consult with her attorneys about this matter because, she claimed, they had been retained by Panzardi through White and therefore were in no position to help her cooperate. With Cabrera–Díaz murdered, we were justifiably worried first and foremost about this potential witness' safety. At the February 6 hearing, we listened to defendant Nieves–Báez' contentions, observed her obviously-terrified demeanor, and determined that her desire was to assist the government were she freed from her binds to Panzardi. Since she stated she could not trust her lawyers to deal with the government because Panzardi controlled them through White, we began to make arrangements for her representation by the Federal Public Defender's Office.

Surprised by what we had learned of the previously-undisclosed arrangements

---

7. This case was the appeal of 85–116 (CC) as a result of Judge Cerezo's denial of White's motion *pro hac vice* in that case.

among the attorneys, mindful of Fed.R. Crim.P. 44(c), and concerned about other potential or actual conflicts of interest, we held a second hearing the following day. At that hearing, the attorneys retained by Panzardi through White, John F. O'Donnell and local counsel for Nieves–Báez, Carlos López de Azúa, candidly confirmed the fee situation, stressing at the same time that their intentions were always to conduct a defense for Nieves–Báez independent of Panzardi's. They asserted that until the day before, they had no reason to believe Nieves–Báez did not want to pursue the matter through to trial. At the February 7 hearing, we finalized Nieves–Báez' representation by officially appointing the Federal Public Defender.[8]

Confronted with evidence of a joint representation scheme that had acted to the detriment of at least one codefendant, and that was executed in significant part by an attorney not admitted to practice in that case, we thought it well within our discretion to deny White's latest *pro hac vice* motion and to leave Panzardi to the sole counsel of Porrata. As we stated then, "White's dubious dealings regarding the representation of Panzardi–Alvarez and Nieves–Báez resulted in interference with the ethical and orderly administration of justice." Opinion and Order, Docket Document No. 274 at pp. 10–11. Specifically, we noted that since White acted as an intermediary for Panzardi in the legal representation of Nieves–Báez, knowing that Fed.R.Crim.P. 44(c) contained limitations upon that type of behavior, he ran aground of the Model Rules regulating the scope of representation, guarding against conflicts of interest, mandating disclosure of material facts to the court and governing action as intermediaries between clients. Based on the arrangements as they admittedly

existed along with the obviously detrimental effects White and Panzardi had on Nieves–Báez, we remained convinced our decision to exercise our discretion against White's admission was valid.[9]

White's next and last application for *pro hac vice* admission was filed in September as a motion to reconsider our previous denial and to enable White to represent Panzardi in connection with his habeas corpus petition. That motion was accompanied by the affidavit by White detailing his version of the events transpiring from December, 1985 through February, 1986. Docket Document No. 288. In pertinent part, White claimed that Panzardi considered Nieves–Báez his common-law wife and that his interest was to secure for her the best representation possible. White Affidavit, p. 4. White averred that Attorney O'Donnell was finally retained after being "presented" by White to both Panzardi and Nieves–Báez, and emphasized that a condition of O'Donnell taking the job was that Nieves–Báez' representation be completely independent of Panzardi's, a condition that was acceded to by Panzardi. White Affidavit, pp. 6–7. White also claimed O'Donnell's retainer was paid without his assistance, although he later admits, "As a convenience only, [he] collected some funds in Puerto Rico on behalf of Mr. O'Donnell as payment of his fee and delivered those funds to him in Florida." White Affidavit, p. 8. In essence, White claims that he only: (1) attempted to secure counsel for Nieves–Báez in response to Panzardi's request; (2) suggested O'Donnell's availability to both Panzardi and Nieves–Báez; and (3) arranged for "some funds" to be made available to O'Donnell. He asserts that none of those activities amount to a disciplinary violation.

---

**8.** Gloria Nieves–Báez was sentenced originally to six years. Because of her subsequent cooperation, we later reconsidered and, on August 6, 1987, reduced her term of imprisonment to four years. Docket Document No. 281.

**9.** In retrospect, we must candidly admit that we could have done more before arriving at the conclusions we set forth, both as a matter of fairness to all of the defendants and their attorneys, as well as to determine the full scope of

control Panzardi continued to hold over his subordinates. We remain, however, convinced that our actions were wholly justified. We made our intention known from the start that we did not want the integrity of the criminal justice process tarnished in any way. We thought it the wisest course to confront any indiscretion rather than allow a potentially explosive situation to lay unattended. In that respect, we always acted above-board.

We continued to refuse White's application in an order issued October 8, 1987. Docket Document No. 291. Then, we affirmed our view that "Mr. White participated in a scheme of virtual joint representation without disclosure to this court, and that the scheme operated, at least for some time, against the interests of codefendant Nieves–Báez." Order, Docket Document No. 291 at p. 2. Although there could be no question that the motion was denied, we nonetheless accepted all of Panzardi's section 2255 filings, admittedly prepared by White, and will address the arguments made therein as we consider the habeas corpus petition.[10]

Panzardi has now moved *pro se* for our recusal. Docket Document No. 295. After setting forth Panzardi's allegations and purported grounds for recusal, we shall explain why that request, too, will be denied.

### III.

Essentially, Panzardi asserts that the impartiality of this court has been called into question by our treatment of Attorney White. Specifically, he claims that our denial of Mr. White's *pro hac vice* motions and the allegations made concerning White's unprofessional behavior "reveal a deep-seated personal hostility towards [White]." Recusal Motion, p. 10. Because our supposed animosity for White is bound to affect our consideration of all pending matters concerning Panzardi, he moves for our removal not only from ruling on his habeas petition but also from reconsidering our decision denying his Rule 35 motion for reduction of sentence.

While personal bias toward a party's attorney—or, as in this case, attorney of choice—would certainly be appropriate grounds for reversal, we state now that no such bias has ever existed. According to Rule 4(a) of the Rules governing Section 2255 proceedings, the original trial and sentencing judge shall be the first to receive and pass upon the habeas motion. Absent compelling reason to override that assignment, we shall not shirk our responsibility to see this case through to its conclusion.

Panzardi bases his motion on the standards articulated in 28 U.S.C. sec. 455(a), which reads:

> Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.[11]

The standard under Section 455(a) is an objective one. "The proper test ... is whether the charge of lack of impartiality is grounded on facts that would create a reasonable doubt concerning the judge's impartiality, not in the mind of the judge himself or even necessarily in the mind of the litigant filing the motion under 28 U.S.C. Section 455, but rather in the mind of the reasonable man." *U.S. v. Cowden*, 545 F.2d 257, 265 (1st Cir.1976), *cert. denied*, 430 U.S. 909, 97 S.Ct. 1181, 51 L.Ed. 2d 585 (1977) (citations omitted).

Under that test, then, a judge's perceived attitude or behavior toward an attorney could compel disqualification, since certainly such behavior could lead to an objective impression of partiality. Merely one or even a series of adverse rulings on points of law would not be enough to have the case reassigned, *U.S. v. Cepeda Penes*, 577 F.2d 754, 758 (1st Cir.1978), but

---

**10.** The October 8 Order also released Porrata as Panzardi's counsel at petitioner's request. Panzardi was given the opportunity to obtain other representation or to have the court appoint an attorney. Because he declined to do so if he could not retain White, Panzardi's Section 2255 petition is technically *pro se.*

**11.** Panzardi correctly limits his motion to this statute and not also to 28 U.S.C. Section 144 which mandates the removal of any judge from a case in which he has a "personal bias or prejudice" for or against any party. It is well established in this Circuit that the information

creating the personal bias must have been acquired extra-judicially; that is, it must not have been obtained as a consequence of judging the matter. *U.S. v. Kelley*, 712 F.2d 884, 889–90 (1st Cir.1983). *See also U.S. v. Mirkin*, 649 F.2d 78, 81–82 (1st Cir.1981), *Union Independiente v. Puerto Rico Legal Services*, 550 F.Supp. 1109, 1111 (D.P.R.1982). Panzardi admits that no such extrajudicial basis exists for the alleged bias, limiting himself to attacking the partiality of the court solely because of our behavior within the context of this case.

"[t]here may indeed be instances when a judge's attitude toward a particular attorney is so 'virulent' that the judge's impartiality concerning the attorney's client might reasonably be questioned." *U.S. v. Kelley,* 712 F.2d 884, 890 (1st Cir.1983).

■ With the standard laid out, we can now address Panzardi's claims and determine, objectively, whether or not they are credible. As far as we can discern, Panzardi makes three somewhat distinguishable claims that this court cannot be impartial in considering the habeas corpus petition. He first asserts that "this Court's decision to deny him any sentence reduction at all following his extraordinary cooperation certainly justifies the inference that this Court never intended to respond favorably to this Defendant's expectation that his sentence would be mitigated to some reasonable extent as a result of his cooperation with the Government." (Memorandum of Law accompanying Recusal Motion, p. 3) (hereinafter "Recusal Memorandum"). As we explain below in our reconsideration of Panzardi's sentence, *infra,* the original sentence was based on the heinousness of the crime. We had and continue to have no intention to minimize the impact of Panzardi's cooperation and have adjusted his sentence accordingly.

Panzardi next asserts that our demonstrated "hostility" to White evidences a "presumption of criminal intent on Mr. White's part." Recusal Memorandum, p. 4. To the contrary, the only presumption we entertained was that since *pro hac vice* admission was a privilege and not a right, *Thomas v. Cassidy,* 249 F.2d 91, 92 (4th Cir.1957), *cert. denied sub nom Fitzgerald v. Cassidy,* 355 U.S. 958, 78 S.Ct. 544, 2 L.Ed.2d 533 (1958); *Panzardi–Alvarez,* 816 F.2d at 816–17, we could balance the integrity of the court against any detriment we foresaw from admission to an out-of-state attorney. Although case law elsewhere, *e.g. In re Evans,* 524 F.2d 1004 (5th Cir.

1975), may counsel differently, we do not understand our Circuit to require a full evidentiary hearing before denying admission for ethical reasons. The fact that the fee arrangements were not disclosed to the court despite the fact that attorneys for both Panzardi and Nieves–Báez were awaiting responses to their requests for *pro hac vice* admission remains undisputed and we remain convinced that this court would not have been well served by the presence of those attorneys.

More important, Panzardi's sixth-amendment rights were never abridged by our action given the number of more than adequate attorneys to assume the role of his counsel. Our actions in February 1986 were motivated not by hostility toward White nor by any unwarranted presumptions, and certainly not by animosity toward Panzardi. Our only concern was to preserve the integrity of this court and of the proceedings before it.[12] Panzardi's assertion that those actions constitute a basis for concluding that we can no longer be impartial is quite simply groundless.

Finally, Panzardi asserts that it would be inappropriate for us, in the context of reviewing his habeas corpus petition, to once again confront certain factual determinations. Panzardi contends that this court became an "investigator, a prosecutor, and a judge when it decided to transform a Motion for Conflict filed by the Government in Ms. Nieves–Báez' case into an *ex parte* hearing on the pending Motion to Appear *Pro Hac Vice* filed by [Panzardi] on behalf of Mr. White." Recusal Memorandum, p. 8. No characterization could be further from the truth. Our motivation during and after those hearings, which were always held on the record,[13] was to ensure a fair trial for all of the defendants. We believe we made the appropriate balance then and have subsequently received no evidence indicating our determination

---

**12.** At this point in time, not only were we dealing with the circumstances of the death of informer Cabrera–Díaz, but also with the disqualification of Judge Cerezo in criminal 85–116 by reason of threats against her life. With this scenario, it would have been irresponsible to turn our heads form this additional and dangerous indiscretion.

**13.** With the exception of a brief interview in chambers with Messrs. O'Donnell and López de Azúa before the February 7, 1986 hearing.

was incorrect. Nonetheless, Panzardi believes we will be partial in evaluating what has transpired for the purposes of ruling upon his Section 2255 petition—a claim that is quite serious and needs to be addressed.

The notion that a trial judge should be wary of being in the position of reviewing a factual determination he has already made stems from the 1967 First Circuit decision, *Halliday v. United States,* 380 F.2d 270 (1st Cir.1967). There the Circuit held that a judge who had administered a guilty plea under Rule 11 could not later pass upon whether or not the plea was voluntary. *Halliday* concerned a judge in the position of "reweighing factual inferences and credibility" with the understanding that the previous determination had been erroneous. *Halliday,* 380 F.2d at 272. The Circuit found that in that situation, "hearings on factual issues occasioned by an initial failure to comply with Rule 11 combine whatever ordinary hazards lie in self-review of factual determinations with the danger of improperly interjecting personal recollections of matters outside the record." 380 F.2d at 274. *Halliday* is thus completely distinguishable from the instant case, since we are concerned not with a previously-incorrect determination, but rather with evaluating Panzardi's representation in light of existing sixth-amendment standards. Since our previous determination was unmotivated by any personal animus, and since there has been no incorrect legal determination to cloud our ability to review, no reason under the *Halliday* standard exists for forfeiting our jurisdiction.

Panzardi further relies upon the following quotation from a later First Circuit decision, *O'Shea v. United States,* 491 F.2d 774 (1st Cir.1974), elaborating upon reasons for caution when judges revisit factual determinations they once made:

The most important matter is the nature of the new proceeding and its relationship to the old one. If, for example, the case is remanded for a new factual determination by the district judge, the fact that he has already made a resolution, particularly if this involved error on his part, may make it difficult for him to reapproach the question with a free and open mind. On the one hand, he may find it difficult to rid himself of his prior conclusions. More likely, he will tend to lean over backwards. Even if he overcomes both difficulties, it may not be without great personal effort. At the same time, both parties may be apprehensive of the obstacles in the way of its accomplishment. In these cases we have indicated a strong preference for a new fact finder.

491 F.2d at 779 (citations omitted.)

Nothing about our previous behavior leads us to conclude that we cannot still approach this matter with an open mind. We have repeatedly stated that our main concern was to ensure fair proceedings for each and every defendant and not to personally attack any of the parties or their attorneys. To our knowledge, we have made no legal errors. Nevertheless, we are quite prepared to reevaluate our actions in the light of Panzardi's 2255 claims. We had every intention of providing Panzardi with effective assistance of counsel and will certainly take the appropriate action if that was not the case. We are well aware that this means taking another look at our denial to Panzardi of his counsel of choice as well as rating the performance of the attorney that did represent him. Just as our previous actions were not generated from any wellspring of hostility or animosity, they are not carved in stone. We shall approach and evaluate Panzardi's claims under the appropriate legal standards and guidelines, and if the law warrants reversal on any or all grounds, we shall no doubt award it.

## IV.

Having resolved the issue of our recusal, we turn next to the habeas corpus petitions that have been duly filed before this court along with opposing briefs from the government. Exercising the discretion afforded by Rule 8(a) of the Rules Governing Section 2255 Cases in the United States District Courts, we have determined that no hearing is necessary. All of the pertinent facts and arguments have been ably

set out before us and considering our familiarity with the case, an evidentiary hearing would serve no useful purpose.[14]

Panzardi asserts four separate claims in his 2255 petition. The first three can be broadly grouped as sixth-amendment claims of ineffective assistance of counsel, one concerning our denial of White as his counsel of choice and the other two regarding the ability of attorney Porrata to conduct his defense. Panzardi also advances a violation of his Plea Agreement by this court since he claims he received a sentence incommensurate with his level of cooperation with the government. After an exhaustive review of the record, we find that none of these claims has merit and therefore deny petitioner's request for habeas corpus relief. However, we also take this opportunity to reconsider our sentence for Panzardi and will in fact adjust it, taking into consideration his cooperation with federal officials.

## A.

■ We first address Panzardi's claim of a Sixth Amendment violation because he was not afforded the representation of Charles White, his counsel of choice. "It is hardly necessary to say that the right to counsel being conceded, a defendant should be afforded a fair opportunity to secure counsel of his own choice," *Powell v. Alabama,* 287 U.S. 45, 53, 53 S.Ct. 55, 58, 77 L.Ed. 158 (1932), but it is equally true and well-established that an accused's right to counsel of his choice is not absolute. *E.g., United States v. Panzardi-Alvarez,* 816 F.2d 813, 816 (1st Cir.1987); *United States v. O'Malley,* 786 F.2d 786, 789–93 (7th Cir. 1986); *United States v. Dinitz,* 538 F.2d

1214, 1219 (5th Cir.1976), *reh. denied,* 542 F.2d 1174 (1976), *cert. denied,* 429 U.S. 1104, 97 S.Ct. 1133, 51 L.Ed.2d 556 (1977).

Securing a defendant's effective assistance of counsel as mandated by the Sixth Amendment requires a trial judge to maintain the proper balance between a "defendant's interests in retaining counsel of his choice against the public's interest in the prompt, fair, and ethical administration of justice." *Panzardi-Alavarez,* 816 F.2d at 817. *Accord Dinitz,* 538 F.2d at 1219 ("Traditionally, courts enjoy broad discretion to determine who shall practice before them and to monitor the conduct of those who do.") This Circuit has made it clear that what is proscribed by the Sixth Amendment is an arbitrary determination of when a defendant may have the benefit of counsel of his choice and when he may not. *See Panzardi-Alvarez,* 816 F.2d at 816–18 (approving district court use of ethical guidelines to refuse admission while disapproving use of purely numerical limitations). *Cf. United States v. Harvey,* 814 F.2d 905, 924 (4th Cir.1987) (defining the right to counsel of choice in context of criminal forfeiture and attorney's fees as "the right to be free of arbitrary governmental interference in choosing, paying, and retaining the services of privately-retained counsel.")

We have stated repeatedly that our denial of White's *pro hac vice* motions, after the original, incorrectly filed one, were never based solely upon the local one-case-per-year rule, but were instead predicated on the behavior of White and its effect on codefendant Nieves-Báez. We never acted arbitrarily, but instead based our rulings

---

**14.** We anticipate some objection, particularly from petitioner Panzardi, concerning the lack of a hearing. Perhaps we can address that concern at least in part at this time. The issue of White's behavior and our subsequent actions does have an impact on Panzardi's Sixth Amendment guarantees as we shall outline later. There is no need for an evidentiary hearing on that point, however, since the affidavits of White, O'Donnell and Panzardi have already been submitted with their side of the story. This Circuit has adopted the rationale of the advisory notes to Rule 7 of the Rules Governing Section 2254 and Section 2255 proceedings,

which require affidavits "to avoid the expense of an unnecessary evidentiary hearing." *Porcaro v. United States,* 832 F.2d 208, 212 (1st Cir.1987). Moreover, as we shall demonstrate later, we need not determine the credibility of the assertions of those gentlemen in order to determine whether Panzardi suffered a Sixth Amendment deprivation. *See also Porcaro,* at 214. ("Our approach has been to take the movant's allegations 'as true, except to the extent that they are contradicted by the record or are inherently incredible, and to the extent that they are merely conclusions rather than statements of facts.'") (citations omitted).

on our understanding that the ability to appear *pro hac vice* was a privilege that could be refused upon a determination that the court's interest in the "fair, and ethical administration of justice" superseded Panzardi's interests in White as his counsel of choice. Our action, therefore, constituted no Sixth Amendment deprivation.[15]

### B.

■ Next, we turn to the first of Panzardi's other two sixth-amendment claims and the first that pertains to his representation by attorney Porrata. Panzardi asserts that his transfer to the Metropolitan Correction Center in New York in February 1986 deprived him of the effective assistance of his counsel Porrata during the period before the trial was set to begin on March 10, 1986.

The standard for determining whether Porrata's representation meets the sixth-amendment guarantee of effective assistance of counsel is found in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). There, the Supreme Court articulated a two-pronged test for ineffectiveness. First, the attorney's performance must have been "outside the wide range of professionally competent assistance." 466 U.S. at 690. Second, a claimant must show that in addition to the deficient performance, he suffered prejudice; in other words, a petitioner must prove "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." 466 U.S. at 694. *Accord Perron v. Perrin,* 742 F.2d 669, 672–73 (1st Cir.1984). Moreover, "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland,* 466 U.S. at 690, 104 S.Ct. at 2066; *Perron,* 742 F.2d at 673.

Petitioner does not elaborate much on this sixth-amendment claim except to say that "Mr. Porrata's decision not to take measures to ensure the defendant's prompt return to Puerto Rico aggravated the fact there was not enough time to fully explore the possible legal and factual defenses available." Memorandum of Law accompanying Panzardi's Habeas Corpus Petition, Docket Document No. 271A, p. 14. He also asserts that his transfer to New York was "without reason." Panzardi Habeas Corpus Petition, Docket Document No. 271A, p. 3. After reviewing the events from December, 1986 through March, 1987, we conclude that Porrata's representation during the pretrial period did not fall below constitutional standards.

To satisfy the deficient performance prong of *Strickland,* Panzardi is apparently asserting that Porrata's decision not to try to have Panzardi transferred fell below professional standards of competence. Reviewing all that Porrata did as Panzardi's counsel, we are unable to conclude that his performance was deficient. Immediately after his retention by Panzardi, Porrata filed a host of pretrial motions nearly identical to those filed on behalf of the other codefendants. *See United States v. Panzardi-Alvarez,* 646 F.Supp. 1158 (D.P.R. 1986). His behavior during the months before the case was set for trial was as standard and as competent behavior from a defense attorney as one could expect.

Panzardi was detained outside of Puerto Rico for his own safety and the safety of others. He was classified by the Department of Justice as an extreme security risk because of his background and the possibility of his future cooperation. Indeed, even now he stresses the fact that there remains a price on his head despite his enrollment in the witness protection program. Porrata may have made an excellent tactical and practical decision in keeping Panzardi out of Puerto Rico and quite possibly out of

---

**15.** In his petition, Panzardi makes much of the fact that no prejudice need be alleged or proven once an abrogation of the right to counsel of one's choice has been shown. While the dictates of *Flanagan v. United States,* 465 U.S. 259, 267–68, 104 S.Ct. 1051, 1055–56, 79 L.Ed.2d 288 (1984), and also *Panzardi–Alvarez,* 816 F.2d at 818, indeed verify petitioner's assertion, since we have found no violation of the right to counsel of choice, that point has no bearing on our opinion.

danger. We are certainly unwilling to say that his decision not to move for his transfer was a product of professional incompetence.

With the first prong of the *Strickland* test unsatisfied, it is unnecessary to determine whether Panzardi suffered prejudice from Porrata's failure to attempt to effect his transfer. Moreover, since there was no trial, we cannot determine the effects of Panzardi's transfer on that event; the claim of prejudice here must therefore rest on proving his plea invalid—a contention we address in the following section.

### C.

█ We now reach Panzardi's most substantive sixth-amendment claim—that Porrata was ill-equipped and unprepared for trial and because of that, Panzardi had no choice but to plead guilty.

Panzardi asserts that Porrata told him upon his return to Puerto Rico that he was unprepared for trial and further asserts that Porrata "did not move to continue the trial in order to acquire more time to prepare." Panzardi Habeas Corpus Petition, p. 4. Panzardi further asserts the likelihood of his acquittal had there been a trial, since he never intended to kill Cabrera-Díaz, and since it was actually codefendant Cancel who shot him to death. According to Panzardi, Porrata's confessed lack of preparation lead him to conclude that he had no choice but to change his plea rather than pursue his "meritorious defense" vigorously at a trial. Panzardi Habeas Corpus Motion, p. 7.

Although it is possible for inadequate assistance by an attorney to render a guilty plea involuntary and thus a nullity, such ineffective representation was not afforded to Panzardi. "The long standing test for determining the validity of a guilty plea is 'whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defend-

ant.'" *Hill v. Lockhart,* 474 U.S. 52, 56, 106 S.Ct. 366, 369, 88 L.Ed.2d 203 (1985), quoting *North Carolina v. Alford,* 400 U.S. 25, 31, 91 S.Ct. 160, 164, 27 L.Ed.2d 162 (1970). When the claim is made that a plea was involuntary due to defective assistance of counsel, the Supreme Court mandates a two-pronged test based on the *Strickland* sixth-amendment standard. *Hill,* 474 U.S. at 57, 106 S.Ct. at 369. Specifically, petitioner must show first, that "counsel's representation fell below an objective standard of reasonableness," *Id.,* 474 U.S. at 57, 106 S.Ct. at 369, quoting *Strickland,* 466 U.S. at 687–88, 104 S.Ct. at 2064–65, and second, that "there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill,* 474 U.S. at 59, 106 S.Ct. at 370. *See also United States v. Ramos,* 810 F.2d 308, 314 (1st Cir.1987), *United States v. Giardino,* 797 F.2d 30, 31 (1st Cir.1984).

Despite Panzardi's assertions, the record itself contradicts Panzardi's claim of Porrata's ineffectiveness. In addition to the numerous motions already noted, Porrata negotiated the plea agreement which resulted in Panzardi's conviction on only one of the three counts named in the indictment.

Moreover, Panzardi's contention that he acted involuntarily is contradicted by his sworn statement on the plea agreement that his request for a change of plea reflected "[his] understanding and willingness to withdraw [his] plea of not guilty." Docket Document No. 189. This oath was reaffirmed during the colloquy between court and defendant at the change of plea proceedings. In addition to a finding of competency at that time, this court inquired as to Panzardi's satisfaction with his attorney Porrata, and engaged in an extended question and answer session concerning his understanding of the plea arrangement and of the effects his agreement would have on the court.[16]

---

**16.** On two separate occasions we expressly inquired as to the voluntariness of the plea agreement, as well as the quality of Porrata's representation. The first occurred after the court

determined Panzardi's competency to participate in the change of plea proceedings:

    THE COURT: Mr. Panzardi, you are assisted by able counsel Peter John Porrata. Have

In addition to Panzardi's demonstrated voluntariness, the amount of evidence accumulated against Panzardi was overwhelming; it consisted of eyewitness testimony and physical evidence and may quite possibly have included the testimony of codefendant Nieves-Báez. We cannot characterize Panzardi's decision to plead guilty rather than chance a life sentence after trial as at all unreasonable. Although we are not persuaded that Porrata was unprepared, we find that nevertheless Panzardi fails to meet the second prong of the *Hill* standard—that but for Porrata's performance he would have gone to trial. We therefore reaffirm our acceptance of Panzardi's plea of guilty.

### D.

Finally, we address petitioner Panzardi's only remaining habeas corpus contention—that this court violated the plea agreement signed by Panzardi before he plead guilty to Count I of the indictment. Panzardi seems to be alleging that while the plea agreement expressly provided for his cooperation with other government prosecutions to be made known to the court, his sentencing and a later reconsideration took place without the court's knowledge of the full extent of the impact of his cooperation.

At the time of sentencing, we knew of Panzardi's post-plea activities as far as Panzardi, Porrata, and the U.S. Attorney informed us. We subsequently denied Panzardi's motion for reconsideration. Later the government moved to inform us of the full extent of Panzardi's post-sentence cooperation and we indicated that we would look into the matter anew under Fed.R. Crim.P. 35. Docket Document No. 274.

Based on the representations made by the government, and considering the relatively-moderate sentences imposed by Judge Pérez-Giménez in criminals 85–116 and 85–117, along with the fact that our 99–year sentence was concurrent with those other terms and not enhanced under 18 U.S.C. sec. 4205(b)(1), we now resentence Panzardi as follows.

Panzardi will remain sentenced to ninety-nine years concurrent with the sentences imposed in cases Nos. 85–116 and 85–117. However, we strongly urge the Parole Commission to consider Panzardi's cooperation with the Department of Justice for purposes of parole eligibility guidelines, even before he meets the ten-year minimum imprisonment period mandated by a 99–year sentence. 18 U.S.C. secs. 4205(a) and (b)(2). The prisoner may then be released on parole at such earlier time as the Commission may determine.

In resentencing Panzardi we have considered not only his extensive assistance to the Department of Justice, but also the fact that other participants also sentenced to ninety-nine years for the same crime, namely Cancel and Hernández-Hernández, have not availed themselves of the opportunity to cooperate. Inasmuch as there is always the possibility that they have nothing to offer the government, it is unfair for Panzardi to reap a great benefit, while someone like Hernández-Hernández, who can fairly be described as merely an underling following orders, remains committed for as long as the Parole Commission may decide.

### V.

### A.

■ Turning next to petitioner Cancel's claims, we are transported to the period immediately before and directly following his decision to plead guilty. Cancel initially contends that his decision to sign the Plea Agreement was tainted by the ineffective

---

you had an opportunity to discuss your case with him?
THE DEFENDANT: Yes, your Honor, I did.
THE COURT: Are you satisfied with Mr. Porrata's represention?
THE DEFENDANT: Yes, I am. (Change of Plea Hearing Transcript, March 10, 1986, p. 6).
And again, later in the hearing:

THE COURT: Has anyone threatened you or has anyone else forced you in any way to plead guilty?
THE DEFENDANT: No, your Honor.
THE COURT: Is this a voluntary act on your part?
THE DEFENDANT: Yes, it is. (Transcript, p. 11).

assistance rendered to him by his attorney, Mr. Joaquín Monserrate. Cancel asserts that while his attorney explained that parole eligibility for the 25–year sentence to be recommended by the government would be eight years, Monserrate never explained that a life sentence imposed after trial would qualify him for parole in only ten years. Cancel now says that omission materially affected his decision about whether or not to consent to the Plea Agreement. Indeed, he states that he would have opted to put the prosecution to its test at trial had he known how slight that difference was. As already noted, this court rejected the government's recommendation and imposed a sentence of ninety-nine years, plus a $150,000 fine. Cancel will not be eligible for parole for another eight years.

Our evaluation of the legitimacy of Cancel's plea rests upon the same *Hill v. Lockhart* standards enunciated above. As with Panzardi, we find first that Cancel's legal representation was more than adequate and second, that no prejudice resulted from the alleged omission.

We note at the outset that the attorney in question, Mr. Joaquín Monserrate, has the reputation of being one of the premiere criminal defense attorneys in Puerto Rico. In our opinion, Mr. Monserrate lived up to his reputation when he represented the petitioner. While we seriously doubt that Mr. Monserrate failed to appraise Cancel of each and every course of action and their parole consequences (indeed, Monserrate has filed an affidavit to that effect), even had he not mentioned the difference between eligibility for parole for a life sentence and for a 25–year sentence, his representation would still have been adequate.

We are not prepared to say that "reasonably competent advice," *McMann v. Richardson*, 397 U.S. 759, 770, 90 S.Ct. 1441, 1448, 25 L.Ed.2d 763 (1970), requires a detailed explanation of the parole consequences for every option. It must be remembered that eligibility for parole is far from a guarantee of release; it is simply the date at which a prisoner's situation can be reviewed and may have little bearing on when his prison terms may end. Perhaps

it is for this reason that Fed.R.Crim.P. 11(c)(1) does not require a judge to explain every parole consequence to a defendant before accepting a guilty plea, but only the maximum sentences and "the effect of any special parole term." *Cf. United States v. Alan Peter Quin*, 836 F.2d 654 (1st Cir. 1988); *United States v. Gavilan*, 761 F.2d 226, 228 (5th Cir.1985) (ignorance of deportation as a collateral consequence of a guilty plea does not render the plea invalid). *See also Houston v. Lack*, 625 F.Supp. 786, 793 (W.D.Tenn.1986), *dism'd without opinion*, 819 F.2d 289 (6th Cir.1987) (citing cases that hold defendant not required to be informed of all collateral consequences of a guilty plea); *United States v. Nagaro-Garbin*, 653 F.Supp. 586, 590–91 (E.D.Mich. 1987) (affirmative misrepresentation required before guilty plea validity is questioned).

Moreover, whether or not Mr. Monserrate's assistance was able, Cancel suffered no prejudice from the alleged omission. As correctly stated in the habeas corpus petition, the proper standard of review for determining whether a plea was voluntarily made is whether the information, if known, would have affected defendant's decision to go to trial. Although Cancel claims that the parole considerations were the crucial element in his decision to plead rather than assert his right to a trial, we are unable to find such a contention reasonable.

Cancel's determination concerning the plea agreement versus a trial necessarily rested on an assessment of his possibility of acquittal at trial. Because the Supreme Court concluded in *Hill* that "predictions of the outcome at a possible trial ... should be made objectively," 474 U.S. at 59–60, 106 S.Ct. at 371, we cannot take into account contentions of might-have-beens concerning judicial or jury decisions. We must be similarly objective in determining what a reasonable decision on the part of the defendant would have been; we must assume a reasonable defendant, not an excessively-risky or idiosyncratic one, is making the decision. For this reason, we cannot simply take at face value his assertions that he definitely would have made a different choice had he been given different

information. Indeed, if Cancel were fully informed, as he contends he was not, and if he still thought his chances of victory at trial were slim, it would have been irrational to gamble on an acquittal rather than to accept the prosecution's offer of a recommendation of twenty-five years. Put another way, it would have been unreasonable not to opt for the chance of less time over the near-certainty of a much longer sentence after trial.

We make these assertions because, like Panzardi, Cancel was faced with convincing physical and eyewitness evidence against him. Although he now contends that he only supplied the weapons while Panzardi was actually in charge, such assertions do not diminish the probability of his conviction at trial. He was present at the scene of the crime, provided an Ingram machine gun and a .44 cal. Magnum revolver to Panzardi and Hernández-Hernández, and readily returned to the scene after Cabrera–Díaz was shot. Cancel's contention that knowledge of the 8–year/10–year differential would have led him to opt for a trial is, thus, objectively unreasonable. Since his best option was to sign the agreement rather than depend on the slim chance of acquittal or a sentence after conviction of less than 25 years, he suffered no prejudice from any defective advice he claims was provided to him by Mr. Monserrate. By opting to plead guilty he had the chance for a sentence that in all likelihood would have eluded him at trial. Cancel made the best, indeed the only, choice available to him and therefore suffered no prejudice.

### B.

Cancel next claims that improper information was considered in the course of his sentencing, consequently rendering his sentence invalid. Once again, a closer examination of the sentencing proceedings and of the facts surrounding that event reveals no impropriety.

Cancel rests his charge on a statement contained in his presentence investigation (PSI) that both he and codefendant Panzardi were "major drug dealers in Puerto Rico." At his sentencing hearing, Cancel moved to withdraw his plea, claiming that no support was given for that assertion which, in addition, was irrelevant to the charged offense. We stated that the challenged information would not be a consideration in the sentencing of petitioner:

THE COURT: I am going to deny the motion to withdraw the plea of guilty. I was very cautious when I accepted that plea.... I went through the facts and I specifically asked each one of the defendants that pled guilty that day whether they indeed were aware of the fact that I was going to use my own judgment in passing upon this matter.

... I am going to order the probation officer to eliminate the paragraph that appears at page two of the memorandum [with Cancel's PSI] ... inasmuch as he is being sentenced today for the violation of the civil rights resulting in the death of Mr. Avelino Cabrera Diaz and for retaliating against a federal witness and for nothing more.

It may seem ... that the judge cannot leave things aside but I suppose that by now we do know that in this type of proceedings versions by one side or the other are simply versions. They are taken as that. They are not taken as evidence. They are simply taken as versions and the court really relies on our own judgment as to the seriousness of the offenses and circumstances under which they were committed and nothing more.

Sentencing Hearing Transcript, April 25, 1986, pp. 9–10.

Cancel now claims that despite this pledge, the PSI assertions were factors in his sentencing. As evidence for his contention, Cancel notes that although his participation in the crime was only the "peripheral" function of providing the weapons for Panzardi and Hernández–Hernández, who actually killed Cabrera and mutilated his body, Cancel received the most severe sentence of the three. He was not only incarcerated for 99 years, but also received an additional fine of $150,000. Cancel claims this difference must be attributed to the

information contained in the presentence report.

A sentence should be vacated as unconstitutional "if [an accused's] sentencing was based on material misapprehension of fact by the sentencing judge," *Diaz Torres v. United States,* 564 F.2d 617, 619 (1st Cir.1977), *citing United States v. Tucker,* 404 U.S. 443, 447–49, 92 S.Ct. 589, 591–93, 30 L.Ed.2d 592 (1972). Such was not the case, however, with Cancel. We are not faced with a consideration of incorrect or constitutionally infirm facts, as were the contentions in both *Diaz–Torres* and *Tucker.* Instead, during the hearing, we stated that the challenged information would not be taken into consideration. Cancel was sentenced only for his role in the death of Cabrera–Díaz.

A simple exercise in logic confirms our ruling. Both Cancel and Panzardi were the subjects of the allegedly improper information. The fact that one was apparently sentenced more severely cannot, therefore, be based on that aspect of the PSI. In fact, all of the defendants, including Hernández–Hernández, were sentenced for the heinous crime they committed. Ninety-nine years incarceration reflects the brutality of this murder and mutilation of a federal witness. The reason only Cancel was fined can be found in the financial reports made available to the court before the sentencing. While the others were assessed as unable to pay such a fine, we determined that Cancel could in fact be so charged. Moreover, as we have already noted, Panzardi was at that time the subject of a related civil forfeiture action, and eventually all of his known assets, i.e., a fleet of aircraft and two high-performance cars, were turned over to the government.

## VI.

In sum, the action we have taken is as follows:

1. Panzardi's motion for our recusal from considering his habeas corpus petition and motion for reduction of sentence is DENIED.

2. Panzardi's habeas corpus petition is DENIED.

3. Panzardi's sentence is reconsidered in the sense that the Parole Commission should consider Panzardi's extensive cooperation with the government for purposes of parole decisions applicable to this particular defendant as outlined in the court's opinion and order. A separate order will issue directed to the Parole Commission.

4. Cancel's habeas corpus petition is DENIED.

IT IS SO ORDERED.